FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 1 8 2010

JAMES N. HATTEN. CLERK
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

<table>
<tr><td>
J.D.P. a minor by his next friend<br>
Martin Pope his father, and<br>
MARTIN POPE,<br><br>
     Plaintiffs,<br><br>
v.<br><br>
CHEROKEE COUNTY, GEORGIA<br>
SCHOOL DISTRICT, et al.,<br><br>
     Defendants.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>
CIVIL ACTION FILE<br><br>
NUMBER 1:08-cv-165-TCB
</td></tr>
</table>

## O R D E R

This matter is before the Court on Defendant Cherokee County, Georgia School District ("CCSD") and the numerous Individual Defendants'[1] motion for summary judgment [56].

---

[1] The individual Defendants are as follows: Dr. Frank R. Petruzielo, the superintendent of CCSD; Sarah Hoskins, a former special education director for CCSD; Hamilton "Ham" Kimzey, a former special education director for CCSD; Shirley Green, a former special education supervisor for CCSD; Dr. Carol Haisten (the second amended complaint improperly identifies her as Dr. Carol "Haistens"), a former special education supervisor for CCSD; Joanne May, the principal at Chapman Intermediate School ("CIS"); Cindy Cooper, an assistant principal at CIS; Lori Thompson, a teacher at CIS; Pat Hagen, a teacher at CIS; Gina Canuel, a speech therapist for CCSD and also a staff

## I.   Background

### A.   Plaintiffs' Response to Defendants' Statement of Material Facts

In support of their motion for summary judgment [56], Defendants filed a statement of material facts in compliance with Local Rule 56.1(B)(1). In support of their response in opposition to the motion for summary judgment [69], Plaintiffs filed a response to the statement of material facts [68]. Plaintiffs' response to the statement of material facts largely fails to comply with the Local Rules. Although Plaintiffs dispute at great length a number of Defendants' statements of fact, Plaintiffs fail to provide specific citations to record evidence that support their disputes. This failure generally leads to serious consequences. Local Rule 56.1(B)(2)(a)(2) provides as follows:

> This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not

member at the after school program at CIS; and Daniel W. Peabody, a CCSD police officer. All of these Defendants have been sued in their official and individual capacities.

material or otherwise has failed to comply with the provisions
set out in L.R. 56.1(B)(1).

Therefore, for all facts to which Plaintiffs object without specific citations to
evidence, the Court may deem those facts admitted. *See Brandon v.
Lockheed Martin Aeronautical Sys.*, 393 F. Supp. 2d 1341, 1347-48 (N.D.
Ga. 2005) (reaching same result in case involving a pro se plaintiff).

In their response brief in opposition to the motion for summary
judgment, Plaintiffs assert a variety of additional facts which they contend
are material and present a genuine issue for trial. Although these
statements also do not comply with the requirements of Local Rule
56.1(B)(1)(2)(b), the Court finds that these factual statements are generally
well-supported by the record and therefore will consider these additional
facts.

What follows is a summary of facts as presented by Defendants in
their statement of undisputed material facts. The Court will note those
occasions in which Plaintiffs offer additional or conflicting factual
statements. However, in the event that Plaintiffs have objected to one of
Defendants' statements of fact but have not provided a citation to the
record evidence that rebuts Defendants' statement in either their response
to the statement of material facts or in their response in opposition to the

motion for summary judgment, the Court will deem Defendants' fact admitted.

## B.   Facts[2]

### 1.   J.D.P.'s Enrollment with CCSD

In 1998, Plaintiff J.D.P. was seven years old, when he enrolled in CCSD schools.    He is a student with disabilities as defined by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. Specifically, he has been diagnosed with autism, mental retardation, a speech/language disorder, attention deficit/hyperactivity disorder, and oppositional defiant disorder.    Pursuant to the IDEA, CCSD created an Individualized Education Plan ("IEP") that provided that J.D.P. was to receive "one-on-one" supervision by specially trained personnel and placement in special education classes.    J.D.P. received his special education services at Mountainbrook School, which is a part of the Georgia psychoeducational network and serves students with severe behavioral issues in a number of counties in Georgia, including Cherokee County.  He attended school at Mountainbrook from the time he began attending school

---

[2] For a detailed account of the procedural history of this case and the underlying dispute, see the Court's March 23, 2009 order [36].   Included here are only those facts that form the basis of Defendants' motion for summary judgment.

4

in CCSD until January 2, 2003, at which time he began attending the Marcus Behavior Center School at the Marcus Institute in Atlanta.

### 2. 1999-2000 School Year

At all times relevant to this action, CCSD provided an after school program ("ASP") for students enrolled in kindergarten through sixth grade at its elementary and intermediate schools. The ASP is a daycare program for students that begins at the end of the instructional day and runs until 6:00 p.m. Parents pay for their children to attend the ASP.

In December 1999, Martin Pope filed a complaint with the U.S. Department of Education Office of Civil Rights ("OCR") in order to have J.D.P. allowed to participate in an ASP offered by CCSD. In response to that complaint, CCSD permitted J.D.P. to attend an ASP at Boston Elementary School ("BES") beginning in January 2000. BES was the school J.D.P. would have attended based upon his residency. He was in first grade at this time. CCSD transported J.D.P. by school bus from Mountainbrook to BES for his ASP.

In the ASP at BES, J.D.P. was often non-compliant and would regularly engage in aggressive behaviors toward staff and other children.[3] J.D.P. was bigger than the other children in the ASP at BES. He would hit adults, including pinching them or slapping them with an open hand. On the playground he would push other children out of the way in order to get down the slide faster. He would often soil himself, sometimes just before going down the slide, thereby requiring the ASP staff to clean the slide before other children could use it. He would spit at the ASP staff and other children, plop down and refuse to get up, and occasionally run off. Due to his aggressive and defiant behaviors, J.D.P. required one-on-one assistance in the ASP.

### 3. 2000-2001 School Year

While J.D.P. attended the ASP at BES, Dr. Sharon Kent was the assistant principal at BES and was responsible for the ASP there. Dr. Kent had a number of years of experience and training working with severely intellectually disabled students and students with behavior disorders. Her

---

[3] Plaintiffs assert that J.D.P.'s aggressive behavior was not willing or malicious, but rather a manifestation of his mental disorders. Defendants do not contest this assertion.

training included training on de-escalation techniques and physical restraint from Dr. Paul Baker, the director of Mountainbrook.

At the beginning of the 2000-2001 school year, J.D.P.'s one-on-one ASP worker was Steven Culver, whom Martin Pope had recommended for this position.   Culver left for another job after serving J.D.P. for approximately two weeks.  After that, Annie Mathis became J.D.P.'s one-on-one ASP worker.  Mathis was a paraprofessional in a preschool special needs classroom at BES.  She had experience working with special needs children who had cognitive, language, and social/emotional deficits.[4]

### 4.    February 26, 2001 IEP Meeting

On February 26, 2001, CCSD convened an IEP meeting for J.D.P. Among the dozen or so persons attending the meeting were Dr. Kent and Mathis, who were present to discuss J.D.P.'s functioning during the ASP. The meeting participants approved a behavior intervention plan ("BIP") presented by Alicia Walker of the Behavioral Intervention Program, a state-funded program whose purpose was to assist Georgia public school districts with strategies regarding severe behavioral problems.  Mountainbrook had

---

[4] Plaintiffs allege in their response to the statement of material facts that Mathis secluded J.D.P. from other children and that this seclusion failed to provide J.D.P. with an adequate ASP.  However, Plaintiffs fail to provide any citation to the record to support this allegation.  Thus, the Court will not consider this allegation.

requested assistance from the Behavioral Intervention Program in addressing J.D.P.'s aggressive behaviors. The meeting participants also recommended that visual cues and prompts be used with J.D.P. and that BES ASP staff come to Mountainbrook to receive instruction on the implementation of J.D.P.'s BIP and the use of visual cues and aids.

Within a few days, Mathis observed J.D.P. at Mountainbrook as recommended by the IEP team. She made copies of the visual cues used by Mountainbrook, which she subsequently utilized in the ASP at BES. Building upon the use of cues and prompts, Mathis also took photographs of items J.D.P. regularly used in the ASP and utilized these photographs as visual aids to assist J.D.P. in choosing among preferred activities, such as playing with his favorite musical toy. This strategy had been discussed during the February 26 IEP meeting. In May 2001, Mathis returned to Mountainbrook for a follow-up observation.

### 5.    June 2001 Settlement Agreement

On May 9, 2001, Martin Pope wrote a letter to Hamilton ("Ham") Kimzey, CCSD's director of special education, requesting a due process hearing regarding J.D.P. In June 2001, before such a hearing was convened, the parties entered into a settlement agreement pursuant to

which CCSD agreed to allow J.D.P. to continue attending the ASP and agreed to develop a section 504 individual accommodation plan ("504 plan") for the ASP. The settlement agreement further provided as follows:

> The [CCSD] will select a team to meet with Mr. Pope, which will include appropriate staff from the Mountain Brook [sic] program where [J.D.P.] is currently enrolled. The Plan will include appropriate activities for [J.D.P.] during the time he is in the after school program and will include [J.D.P.] in activities with non-disabled children to the maximum extent appropriate. The [CCSD] will also provide necessary and ongoing training for the staff in the after school program to enable the staff to implement [J.D.P.'s] behavior intervention plan. The training for the staff will include staff from the Mountain Brook [sic] program who have worked with [J.D.P.].

As a final condition of the settlement agreement, Martin Pope agreed to withdraw his request for a due process hearing.

### 6.    September 2001 504 Plan

On September 12, 2001,[5] CCSD convened a meeting to develop a 504 plan for J.D.P.'s participation in the ASP. The meeting participants included Martin Pope; Dr. Carol Haisten, a CCSD supervisor for special education programs for students with autism and emotional behavior

---

[5] Defendants' motion for summary judgment and statement of material facts both state that this meeting occurred on September 21, 2001. Plaintiffs do not object to this statement. However, the 504 plan itself indicates that the meeting occurred on September 12, 2001. The Court considers this to be a typographical error and finds that this error has no bearing on the resolution of Defendants' motion for summary judgment.

disorders and the CCSD's liaison with Mountainbrook; Dr. Kent; and Debbi Peck, J.D.P.'s teacher at Mountainbrook.

The accommodations developed at that meeting included the use of a one-on-one ASP worker who needed to be perceived by J.D.P. as an authority figure. Additionally, because there was a lapse of time between J.D.P.'s arrival and the beginning of the regular ASP, J.D.P. required an alternate location and a worker to provide ASP services before the regular ASP began.

The 504 plan identified anticipated discipline problems and positive behavior interventions designed to address these problems. The negative behaviors identified by the 504 committee included aggression toward other children and staff; non-compliance with direction; spitting; soiling himself and refusing to change clothes or go to the restroom; and running away. The positive behavior interventions identified to address his behaviors were redirection and presenting him with a choice of preferred activities. Both behavior interventions were part of his BIP at Mountainbrook.

Finally, the 504 plan identified consequences that the ASP staff could use as the anticipated behaviors occurred. The consequences included

timeout; removal of a toy ball for inappropriate use; same timeout consequences that other fourth-graders had; and removal from other children for the remainder of the day or multiple days for severe aggression.

In his deposition testimony, Martin Pope agreed that the accommodations identified by the 504 committee, of which he was a member, were reasonable accommodations. Further, Martin Pope agreed that the 504 plan developed at that meeting accurately described J.D.P's physical and mental impairments and his educational and mental limitations.

### 7.   2001-2002 School Year

Patrick ("Pat") McCullough, one of the lead custodians at BES, became J.D.P.'s one-on-one worker for the 2001-2002 school year. He was relieved of his custodial duties while working with J.D.P. during the ASP. He would complete his custodial responsibilities after the ASP had ended for the day.

McCullough is a large, stocky man who is very strong in the upper body. He first came to know J.D.P. during the previous school year when J.D.P. would occasionally approach him as he was performing his custodial

11

duties. Additionally, McCullough had assisted the ASP staff when they needed physical help with J.D.P and on several occasions had served as a substitute ASP one-on-one worker when Mathis was absent.

Through these interactions during the 2000-2001 school year, McCullough had developed a good rapport with J.D.P, who responded positively to the way that McCullough spoke with him. McCullough testified that he believes his size further allowed him to be successful in his work with J.D.P. Additionally, McCullough has a son with special needs who attended Mountainbrook at the time he started working with J.D.P. and therefore has some familiarity with how to handle children with special behavioral needs.

In order to prepare him to act as J.D.P.'s one-on-one ASP worker, Dr. Kent arranged for McCullough to receive training through CCSD. McCullough attended training on physical restraints and other techniques taught by Dr. Baker from Mountainbrook. McCullough testified that he utilized the techniques he learned in this training in his work with J.D.P. McCullough also attended training for paraprofessionals taught by Dr. Haisten regarding practical strategies for dealing with children with autism and techniques for behavior management. McCullough testified

that he did not recall being given a copy of any of J.D.P.'s BIPs but acknowledged that it was possible that he had been presented with a copy to review at a meeting. Further, when asked whether anybody had gone over a BIP with him "to point out those things that if [J.D.P.] does this, this is what the recommended behavior—or response is," McCullough answered in the negative.

Martin Pope testified that he "never had any issue with whether or not [McCullough] could work with J.D.P." He further testified that he knew that McCullough had received some training and had assumed that it was the full training called for by the settlement agreement. McCullough remained J.D.P.'s one-on-one ASP worker until the end of the 2003-2004 school year, when J.D.P. stopped receiving ASP services from CCSD. McCullough currently takes care of J.D.P. on most afternoons after school.

On September 25, 2001, Dr. Kent met with J.D.P.'s Mountainbrook behavioral support team. The team, which included staff from the Behavioral Intervention Program, designed and described communication strategies to use with J.D.P. along with modifications to his instructional program, as J.D.P. was continuing to have behavioral difficulties in his school program. Dr. Kent shared with the team how successful J.D.P. had

13

been during the current school year in the ASP.  She informed them that he had the assistance of McCullough, whom he enjoyed, and that he participated in an inclusionary program with his grade level peer group. The team offered Dr. Kent suggestions for indoor activities that J.D.P. might prefer.

The day after that meeting, Dr. Kent took the information she received and believed to be pertinent to J.D.P.'s ASP and developed written procedures for working with J.D.P. in the ASP.  The procedures included how to give J.D.P. directives and how to address specific behavioral issues. The procedures referenced that J.D.P.'s teachers at Mountainbrook were following the same protocol.  Dr. Kent testified that she distributed the document to McCullough and to the ASP coordinators.  She also discussed the procedures with them.  Dr. Kent testified that at the time she was unaware that the 2001 settlement agreement existed and that this agreement required CCSD to train the ASP staff so that they could implement J.D.P.'s BIP.

On March 12, 2002, CCSD convened J.D.P.'s annual IEP meeting. Dr. Kent attended the meeting and presented information on J.D.P.'s current functioning in the ASP.  While Mountainbrook staff described

J.D.P.'s escalating behaviors at school, Dr. Kent informed the others present that J.D.P's behaviors had not regressed in the ASP. She noted that he had a positive interaction with McCullough. Martin Pope discussed with the IEP team the value of observing J.D.P. in the ASP setting and in summer camp. He attributed J.D.P.'s success in the ASP largely to McCullough.

J.D.P. attended the ASP for the entire 2001-2002 school year and was rarely absent. He was never suspended from the ASP, even when he was aggressive or disruptive, because the school recognized that many of his behaviors were manifestations of his disability. Martin Pope testified that J.D.P. had been doing "okay" in the ASP that year due to McCullough's efforts.

### 8.    April 24, 2002 504 Plan

On April 24, 2002, CCSD convened a meeting to review J.D.P.'s 504 plan and revise it, if needed, for the 2002-2003 school year. Keith Bryant, the assistant principal at Chapman Intermediate School ("CIS") in charge of its ASP, attended the 504 meeting. He was present because J.D.P.'s ASP would be provided by CIS during the 2002-2003 school year. Dr. Kent and Martin Pope were the other participants at the meeting.

The meeting participants kept most of the accommodations from the prior year's 504 plan, with the exception of supervision of J.D.P. prior to the start of the ASP because the end of his school day at Mountainbrook would coincide with the end of the school day at CIS. They also decided to add the use of a timer, preferably sand, as a behavior intervention for transitions between activities, as this intervention had proved to be successful at Mountainbrook. Martin Pope agreed that the revised 504 plan was appropriate for J.D.P.

That same day, Bryant observed McCullough working with J.D.P. in the ASP at BES. Dr. Kent informed Bryant of the behaviors J.D.P. exhibited in the past during the ASP and activities the ASP staff had used at BES that were appropriate for J.D.P. Following the 504 meeting, Dr. Kent faxed to Bryant documents regarding J.D.P. and the ASP, including her notes from the September 25, 2001 meeting with the behavior support team at Mountainbrook, the team summary report, and the procedures that she had developed following that meeting and that had produced positive results with J.D.P. in the ASP.

### 9. 2002-2003 School Year

McCullough continued on as J.D.P's one-on-one worker in the ASP at CIS. CCSD made arrangements for McCullough to leave his custodial duties at BES and travel to CIS to work with J.D.P. Following the ASP, McCullough would return to BES to complete his custodial duties. He was paid time-and-a-half for his work in the ASP as it exceeded his regular CCSD work hours.

CCSD contracted with Kim Pisor, a private behavior specialist, to observe J.D.P. and make behavioral recommendations. In a July 14, 2002 letter to Dr. Haisten, Pisor described his observations of J.D.P. during summer camp and offered several recommendations for working with J.D.P., which he then reiterated in a positive behavior support plan dated September 8, 2002 (the "Pisor plan"). Based upon his observations, Pisor recommended that J.D.P. needed individuals to work with him who have established a rapport with him and who also have a physical or psychological presence. McCullough clearly met this description.

Pisor presented his behavior support plan at an IEP meeting for J.D.P. during the fall of 2002. Bryant attended the meeting and received the behavior plan from Pisor. The recommended behavior interventions

were similar to those that Bryant had observed McCullough use with J.D.P. during the ASP.

During the 2002-2003 school year, three male school employees shared the position of assistant coordinator for the ASP at CIS. Bryant testified that he did not provide them with access to J.D.P.'s BIP or the Pisor plan, but did share with them many of the behavior interventions that he learned during the IEP meeting with Pisor. He testified that it was his understanding that the Pisor plan and the BIP were confidential documents. He also had the assistant coordinators observe McCullough's interaction with J.D.P.[6] Finally, Bryant also worked with the assistant coordinators on how to handle transitions between activities with J.D.P. and how to maintain a consistent schedule. Bryant testified that he did not share with the assistant coordinators all of the techniques discussed at the IEP meeting with Pisor because many of the behaviors that had been discussed were not behaviors that the ASP staff observed. He attributed

---

[6] McCullough testified that he had never been asked to train other ASP staff members at BES or CIS regarding the techniques he used with J.D.P. Further, he testified that Bryant had never approached him to inform him that other ASP staff members were going to observe him working with J.D.P.

this to the fact that the ASP was less structured and less demanding than J.D.P.'s instructional program at Mountainbrook.[7]

Early on that year, McCullough and Bryant introduced J.D.P. to the children in the ASP and helped them understand his needs. Each day, McCullough would meet J.D.P. at the bus, check him in to the ASP, take him to the bathroom and then back to the cafeteria for a snack with the other students. J.D.P. would do an activity in the cafeteria and then go outside and play on the playground or go to the gymnasium to play. When all of the children in the ASP were called back into the cafeteria at the end of the day, McCullough and J.D.P. would return to the cafeteria to wait for his father to pick him up. If McCullough was absent, Bryant or one of the three male ASP assistant coordinators would work one-on-one with J.D.P. On one occasion, Julie Bell, J.D.P.'s teacher at Mountainbrook, substituted for McCullough. On the few occasions when McCullough was absent and nobody else was available to substitute for him, Bryant would call Martin Pope and request that he pick up J.D.P. early.

---

[7] Plaintiffs allege that Bryant testified that he did not share any strategies with his ASP staff. This allegation is unsupported by the record evidence. His testimony indicates that he did not get into specific detail regarding some of the interventions suggested by Pisor because it was not necessary to implement them in the ASP, but he at no time testified that he did not share any of the relevant information with his staff.

### 10.   Placement at the Marcus Institute

During the fall of 2002, J.D.P. exhibited unusual physical aggression against his classroom teacher and other staff at Mountainbrook. On December 12, 2002, CCSD convened an IEP meeting to discuss the escalating aggression and to consider other placement options. The IEP team, which included Martin Pope, changed J.D.P.'s placement to the Marcus Behavior Center School at the Marcus Institute in Atlanta (the "Marcus Institute"). Bryant attended the meeting and was aware of the decision to change J.D.P.'s placement.

On January 2, 2003, J.D.P. was admitted to the Marcus Institute for assessment and treatment of aggression and property destruction, including hitting, kicking, spitting, punching, biting, throwing objects and knocking objects to the floor. J.D.P. continued to attend the ASP at CIS. CCSD transported him from the Marcus Institute to CIS, where he would typically arrive at around 4:00 p.m., after the ASP had already started. There were no incidents in the ASP involving J.D.P. during the 2002-2003 school year.

### 11.   May 2003 IEP Meeting

On May 6, 2003, CCSD convened J.D.P.'s annual IEP meeting at the Marcus Institute.   The meeting participants approved a unit protocol developed by Dr. Fisher, the executive director of the Marcus Institute and head of behavioral psychology.   The unit protocol called for physical intervention with J.D.P. and the use of what was termed a "blue room." Intended to seclude J.D.P. from others when the Marcus Institute staff were unable to control him, the blue room was either a room with a magnetic door lock or a room where enough staff could hold the door closed while another staff member could observe J.D.P. through a one-way mirror.   J.D.P. was to be placed in the blue room when he was unmanageable or was putting himself or the other children in danger.   The unit protocol was only to be used at the Marcus Institute.   Dr. Fisher did not typically provide training on the unit protocol to anyone else working with the child until he could document the efficacy of his treatment plan so that he could be sure that the protocol worked.   Bryant did not attend this meeting and testified that he had never seen the IEP plan developed at that

meeting or the BIP incorporating Dr. Fisher's behavior protocol included as a part of the IEP documents.[8]

On May 28, 2003, Martin Pope approved the continued use of the majority of J.D.P.'s 2002-2003 school year 504 plan for ASP services during the 2003-2004 school year. The only change to the 504 plan was the removal of Risperdal as a medication for J.D.P. At that time, Martin Pope had not expressed any concerns to Bryant regarding the adequacy of the 504 plan or the quality of services provided in the ASP.

### 12.   2003-2004 School Year

J.D.P. continued at the Marcus Institute for the 2003-2004 school year and attended the ASP at CIS. Bryant remained in his position as the CIS assistant principal in charge of the ASP. Additionally, he continued to act as the primary backup for McCullough when McCullough was absent.

During the first semester of the 2003-2004 school year, McCullough began to have attendance problems in the ASP due to issues regarding his own son. If Bryant was unavailable for any portion of the ASP on days when McCullough was absent, Bryant would call Martin Pope to come pick

---

[8] The parties dispute what BIP was in effect at the beginning of the 2003-2004 school year. However, as discussed below, the Court finds that this dispute does not affect the Court's decision on the motion for summary judgment.

up J.D.P. early. On those days, the ASP assistant coordinator in charge for the day would get J.D.P. off the bus while Martin Pope was called. The ASP workers at CIS for the 2003-2004 school year were three female employees. These three female ASP assistant coordinators were familiar with J.D.P. and had observed McCullough and J.D.P. working together. However, Bryant had not shared J.D.P.'s BIP with them because he believed that it was a confidential document. If Bryant knew that both he and McCullough would not be present for the ASP, he would make arrangements for the school bus transporting J.D.P. from the Marcus Institute to drop him off at Martin Pope's work.

At this time, Bryant was actively searching for a male worker to serve as a back-up one-on-one ASP worker for those instances when both he and McCullough were unavailable, because the three male assistant coordinators that had performed this role the previous year were no longer employed with the school. Bryant was looking for a male worker to fill this position because J.D.P. had a greater affinity to males. Bryant felt that McCullough continued to be properly trained to address J.D.P.'s needs in the ASP, but felt it important to find an additional back-up worker. Bryant shared his desire to find a back-up ASP worker with Martin Pope and also

expressed to Martin Pope his frustration at how difficult the task had been. Bryant sought assistance from both CIS's principal, Joanne May, and a CCSD special education director, Sarah Hoskins. However, his efforts to find a back-up ASP worker during the fall of 2003 were ultimately unsuccessful.

### 13. The November 18, 2003 Incident[9]

On November 18, 2003, McCullough did not show up for work and had not notified Bryant ahead of time. Bryant had an appointment that afternoon that required him to leave immediately after school. He called Martin Pope and requested that he pick up J.D.P. early. Bryant asked Lori Thompson, the ASP assistant coordinator on duty that day, to get J.D.P. off the bus to await Martin Pope's arrival. Bryant had previously provided information to Thompson regarding J.D.P. and his BIP, but had not shared the actual document with her. Thompson, a certified teacher at CIS, was familiar with J.D.P. and his routine in the ASP. She testified that she had observed McCullough working with J.D.P. and knew his daily routine in the

---

[9] Plaintiffs vehemently dispute the "fictional facts" set forth by Defendants regarding the November 18, 2003 incident. However, Plaintiffs do not provide a single specific citation to the record sufficient to create a factual dispute regarding Defendants' account of the incident. Thus, Defendants' statements of facts regarding the incident are deemed admitted.

ASP.  She regularly greeted J.D.P. when he would arrive for the ASP and would on occasion interact with him while he was playing with the musical toy he routinely brought with him to the ASP.  Thompson had extensive experience and training working with individuals with developmental disabilities, including physical restraint training and personal training from Pisor on methods of de-escalation.  However, Thompson testified that she had received no formal training specifically focused on J.D.P., had received no training directly from McCullough on techniques he used with J.D.P., and had never worked one-on-one with J.D.P.

When J.D.P.'s bus arrived that day, Thompson boarded the bus to help him off.  J.D.P. immediately began asking where "Pat" (McCullough) was, and Thompson informed him that Pat was not going to be there that day.  She then told him what they were going to do and that his father was coming to get him.[10]  Thompson went through the same routine with him that McCullough followed.

J.D.P. got off the bus and into the school building with no problem.  As Thompson was putting his belongings away, J.D.P. walked back toward

---

[10] Redirection was one of the behavior interventions discussed in J.D.P.'s 504 plan for the 2003-2004 school year.

the door and threw the top to his Thermos outside into the grass. When Thompson stepped outside to retrieve the top, J.D.P. followed her. She attempted to get J.D.P. back in the school building by again redirecting him to his routine. She prompted him to come in, go to the restroom and get a snack.[11]   J.D.P. walked away and started spitting. Thompson felt that J.D.P.'s spitting was a sign that he was becoming agitated, so she requested a fellow ASP worker to call for assistance from an administrator. Gina Canuel, J.D.P.'s speech therapist who was at CIS to provide his speech therapy session that afternoon, arrived on the scene and also tried to redirect him to his routine. She told him that she was happy to see him and that they were going to do speech therapy that day. J.D.P. then plopped down, removed his shoes and socks, and started throwing them.

Joanne May, CIS's principal, arrived shortly thereafter. She told J.D.P. in a firm voice to get up, and he complied. As he started towards the door of the school, he picked up his shoes and threw them again, hitting Thompson in the shoulder. J.D.P. continued walking toward the door, then turned and tried to hit Canuel with his fist. He was screaming and flailing

---

[11] Reminding J.D.P. of his next preferred task when he had been non-compliant was a behavior intervention discussed in his 504 plan and in Pisor's positive behavior support plan.

his arms.   He lunged toward Canuel, trying to hit her face and head. Thompson took his hands, one behind his back, and held them.  He leaned back to hit her with his head, but she was able to get out of the way.

At that point, Canuel began the physical restraint process.   She instructed J.D.P. to go down on his knees and he complied.  Then she asked him to lie down. He complied, but was kicking and flailing as he laid down. By this time, Pat Hagen, a teacher of emotional behavior disordered students at CIS, and Cindy Cooper, another one of CIS's assistant principals, arrived in response to the call for assistance. Each person held a hand either on the back of J.D.P.'s heel/ankle or wrist.[12]   J.D.P. was repeatedly told that if he stopped his attempts to kick or hit them, they would let him up.   Canuel was talking to him quietly in an attempt to redirect him to the fact that they could get up and go in the building once they were sure that he was going to get up and move with them.  Cooper was concerned that J.D.P. was going to injure himself.

---

[12] Plaintiffs routinely allege that the ASP staff members "pinned" J.D.P. to the ground and/or piled on top of him.  However, this allegation is not supported by any citation to record evidence.   To the contrary, Cooper testified that the individuals restraining J.D.P. were positioned to the side of him with one hand on either the back of his heel/ankle or wrist.

Cooper had no responsibilities with the ASP at CIS at that time. However, one of her duties during the instructional day was the administration of CIS's special education program. She had training regarding autistic students and strategies for working with them and in de-escalation and physical restraints. She had worked with the Emory Autism Center staff who assisted with academic and behavioral plans for autistic students at CIS. However, Cooper testified that she had no formal training specific to J.D.P. and that no other ASP staff member present that day had formal training specific to J.D.P.

The campus police officer, Officer Daniel Peabody, was summoned and arrived within one to two minutes. Upon arriving, he instructed J.D.P. to get up and assisted J.D.P. up off the ground. Officer Peabody took J.D.P. to the timeout room in Hagen's classroom. The timeout room was a small room that had a door with a Plexiglas window so that the school's staff could observe a child who was in the room. Once in the timeout room, J.D.P. began hitting the Plexiglas window of the door and was kicking the walls in the room for several minutes. Officer Peabody was concerned that J.D.P. would hurt himself and decided to place handcuffs on him. According to a report filed by Cooper that day, the handcuffs seemed to

help alleviate the situation and J.D.P. sat on the floor, yelling off and on while he waited for his father to arrive.

Lori Thompson testified that once J.D.P. began spitting, she was concerned that his behavior was going to escalate. He had exited the school at a high-traffic area near a parking lot where parents routinely park and come into the building to pick up their children from the ASP.[13]  Putnam Ford Road was beside the parking lot, and J.D.P. had a history of elopement.[14]

---

[13] Defendants' statement of undisputed fact paragraph 113 addresses the staff's concern for J.D.P.'s safety on November 18, 2003.  As a part of their meandering response to paragraphs 96 through 113 of Defendants' statement of undisputed facts, Plaintiffs state as follows:

> By the way: Defendant CCSD attempt [sic] to place J.D.P. in a dangerous place outside that gym/cafeteria on Nov[.] 18, 2003 when he plopped on the grass.  They are misleading the Court!  See Pat McCullough's deposition for the description of that area AT THAT TIME AND IN NOV. 2003.  A year later the drive way [sic] was extended so that the parking lot was closer to the area; but NOT on Nov. 18 2003.  The child was perfectly safe when he plopped . . . .

Yet again, Plaintiffs do not comply with the requirements of Local Rule 56.1(B)(2)(a)(2), which requires Plaintiffs to "directly refute[] the movant's fact with concise responses supported by *specific* citations to evidence (including page or paragraph number)." (emphasis added).  Plaintiffs have failed to specifically identify the portion(s) of McCullough's deposition transcript in which he so testified.  The Court's duty does not include culling deposition transcripts for excerpts allegedly supportive of a party's position in the case.

[14] Plaintiffs contend, without citation to the record, that J.D.P. did not have a history of elopement.  However, the record, including testimony from McCullough, in

At McCullough's deposition, Plaintiffs' counsel questioned him extensively as to how he would have reacted to J.D.P.'s actions that day. McCullough testified that in those instances in which J.D.P. would plop down on the ground, he would typically attempt to "sit and wait it out" for up to five minutes. He testified that after briefly waiting and sensing that J.D.P. was ready to comply, he would then use a "one, two, three" count or a bribe such as the withholding of a snack, to get him to get off the ground and to move on to the next activity. When questioned as to what behavior would lead him to touch J.D.P. in order to obtain compliance, McCullough testified as follows: "If he was—if he wouldn't . . . cooperate with me, I would have to—or if his hands or if he would kick or if he would try running from me, I would have to restrain him."

Dr. Catherine Trapani is the director of education at the Marcus Institute and was a participant in J.D.P.'s IEP meetings upon his enrollment at the Marcus Institute. When questioned about the protocol used by the Marcus Institute to address J.D.P.'s plopping behavior at the time of the November 18, 2003 incident, Trapani testified that in the event

---

fact plainly demonstrates that J.D.P. would on occasion attempt to run away. Therefore, the Court finds Plaintiffs' assertion to be unsupported by the evidence and fails to create a genuine issue of material fact.

J.D.P. absolutely needed to be assisted physically in order to get him off the ground, the preferred method was a "backwards two-man carry," but did not provide any explanation as to how that method was carried out. When asked whether she would expect J.D.P. to "lash out" if that method was not used to pick him up off the ground, she testified that it was "hard to say." Further, she testified that she had observed J.D.P. "lash out" even when the protocol was "implemented to the letter" and that "the potential of lashing out is there" whether the protocol was followed or not due to J.D.P.'s general aversion to being touched.

### 14. After the November 18, 2003 Incident

Martin Pope kept J.D.P. out of the ASP for some time after the November 18, 2003 incident, but in early December returned him to the ASP following a 504 meeting with CCSD personnel. Martin Pope testified that he was comfortable with McCullough supervising J.D.P. after the incident. When J.D.P. returned to the ASP, McCullough did not observe any regression in his behavior. Behavior data from the Marcus Institute

31

does not show regression in J.D.P.'s behavior in the month following the incident.[15]

CCSD provided additional training to its ASP staff after the incident. McCullough received prevention and management of aggressive behavior training from Mountainbrook staff on December 8, 11 and 15, 2003. McCullough testified that the training was similar to the training he had in de-escalation and physical restraint techniques when he first began to work with J.D.P. Bryant and McCullough also observed J.D.P. at the Marcus Institute.

In February 2004, Percy Milligan, J.D.P.'s behavior therapist at the Marcus Institute, rode the bus with J.D.P. from Marcus to CIS. After observing J.D.P.'s supervision in the ASP, he informed McCullough and Bryant that he was not recommending any changes in how McCullough worked with J.D.P. Milligan also made a video recording primarily

---

[15] In their response to the statement of material facts, Plaintiffs assert that "the charts from Marcus showed definite regressions [and] Mr. Pope witnessed almost total regression from what progress J.D.P. had made in the 2 years at Marcus." Again, Plaintiffs fail to provide any citation to the record to support this assertion. Thus, this unsupported assertion is insufficient to create an issue of material fact.

Plaintiffs also assert that "J.D.P. still suffers from fear of police [as] was testified to by Mr. Pope and Pat McCullough." Again, Plaintiffs do not provide specific citations to the record to support this assertion. Thus, the Court also finds this assertion to be insufficient to create a genuine issue of material fact.

depicting J.D.P.'s activities at the Marcus Institute.   Bryant and the ASP assistant coordinators all watched the video.

J.D.P. attended the ASP at CIS until the end of the 2003-2004 school year.  At that time, he was no longer eligible to attend the ASP because he had completed the sixth grade, and CCSD provides ASP services only through the sixth grade.

### 15.   CCSD Special Education Oversight

In order to develop an understanding of CCSD oversight with respect to the training of ASP staff on J.D.P., Plaintiffs deposed several CCSD administrators responsible for special education services.

Ham Kimzey served as the CCSD director of special education from the time that J.D.P. enrolled in CCSD in 1998 until the summer of either 2001 or 2002.  Kimzey acknowledged that he participated in the process that resulted in the June 2001 settlement agreement.  He testified that while he did not remember the specifics of that agreement, before such an agreement would have been signed by the CCSD's superintendent, Kimzey would have been responsible for reviewing the terms of the settlement agreement with an attorney for CCSD and finding that the terms of the settlement agreement were acceptable.   However, Kimzey testified that

once the settlement agreement had been executed, the implementation of the terms of that agreement, specifically the training of ASP staff, was an issue that would have been addressed by the school staff at Mountainbrook and BES.

When questioned regarding a September 27, 2000 IEP meeting, Kimzey acknowledged that the meeting minutes indicate that he attended the meeting, but he could not recall being present at the meeting. The meeting minutes state that Dr. Kent requested training for two ASP workers at BES. When asked whether he played any role in training ASP workers, including McCullough, prior to or after Dr. Kent's request, Kimzey testified that he had no direct knowledge about such training and that the training would have been carried out by CCSD employees closer to the school level than someone in his position.

Sarah Hoskins was the CCSD director of special education from 2002 to 2006. She testified that she could not specifically recall reviewing J.D.P.'s IEP, BIP, the Pisor plan, or any other document related to him, but that it would have been her usual practice to do so and that she would have also seen to it that copies of those documents were disseminated to those CCSD employees who were responsible for working with J.D.P. When

questioned regarding who was responsible for the implementation of J.D.P.'s BIP, Hoskins testified that her procedure would have been to have that responsibility fall upon the CCSD special education supervisor responsible for that child's school.

Hoskins acknowledged that the meeting minutes for a May 6, 2003 IEP meeting indicated that she attended the meeting and that the minutes indicated that Hoskins had agreed to follow up on a request from Martin Pope for McCullough to receive training through the Marcus Institute. When asked whether or not she remembered following up as indicated, Hoskins testified that she could not recall whether or how she followed up on Martin Pope's request. She stated that it would have been her practice to have her subordinate, in this case Sherry Green, actually contact the Marcus Institute to make arrangements for additional training for McCullough.

Dr. Carol Haisten served as a CCSD special education supervisor and was responsible for J.D.P. from the time of the June 2001 settlement agreement until June 2003. In her deposition, Dr. Haisten testified that she was aware of the settlement agreement and understood that a direct result of that agreement was the establishment of a 504 plan for J.D.P. She

further testified that when a psychological evaluation for a child had been performed such as the one performed by Pisor for J.D.P., CCSD special education administrators would typically hold a meeting to discuss the results of that report and then distribute the report and any associated IEP, BIP or 504 plan to those individuals responsible for implementing that child's IEP, BIP or 504 plan—in this case, Bryant. Dr. Haisten testified that once a plan had been given to the individual in charge of the ASP, it was that individual's responsibility to share that information with the rest of the ASP staff.

Sherry Green was a special education supervisor for CCSD from July 1, 2003 until June 30, 2007. At the time of the November 18, 2003 incident, she was the special education supervisor assigned to J.D.P. She testified that she was responsible for ensuring that CCSD complied with the requirements of J.D.P.'s IEP and BIP. Green testified that instead of relaying information regarding J.D.P.'s BIP to Bryant, on one or two occasions she requested that Bryant attend J.D.P.'s IEP meetings so that he could hear firsthand the techniques used and recommended by the Marcus Institute. She stated that it was Bryant's responsibility to take that information back and discuss it with those individuals who worked with

J.D.P. in the ASP. However, she testified that she did not know whether Bryant actually followed up with the ASP staff regarding information discussed during IEP meetings.

Green also testified that she did not know whether any ASP staff was trained as directed in the 2001 settlement agreement. Additionally, Green testified that she was unaware of requests for training a person to act as a back-up one-on-one worker for those instances in which McCullough was absent. Further, when questioned regarding Martin Pope's request to Hoskins that McCullough receive training from the Marcus Institute, Green testified that she did not remember receiving any information about such a request.

## C.   Present Action

On January 16, 2008, Plaintiffs filed this action. On February 14, 2008, Defendants filed a motion for a more definite statement. On March 7, 2008, the Court entered an Order granting Defendants' motion and directed Plaintiffs to file an amended complaint within ten days. On March 21, 2008, Plaintiffs filed their first amended complaint.

On April 3, 2008 Defendants filed a motion to dismiss or in the alternative a motion for more definite statement. On April 20, in response

to Defendants' motion, Plaintiffs filed a second amended complaint [21]. On April 28, in light of Plaintiffs' second amended complaint, the Court denied as moot Defendants' motion to dismiss and motion for a more definite statement.

On June 20, 2008, Defendants filed a motion for judgment as a matter of law on the administrative record and a motion to dismiss [30]. On March 23, 2009, the Court entered an order [36] granting Defendants' motion for judgment on the administrative record and granting in part and denying in part Defendants' motion to dismiss.   The Court allowed Plaintiffs to move forward only on their claim in count two of the second amended complaint that CCSD violated the ADA and section 504 by failing to appropriately train the ASP staff.   The Court also denied Defendants' motion to dismiss Plaintiffs' state law claims, pending resolution of the ADA and section 504 claim.   All other remaining claims were dismissed. The Court ordered the parties to conduct discovery on the limited issue of whether CCSD violated the ADA and section 504 by failing to appropriately train the ASP staff.

After a lengthy discovery period, on March 1, 2010 Defendants filed a motion for summary judgment [56] on Plaintiffs' ADA and section 504

claims regarding the alleged failure to adequately train the ASP staff.[16]  On May 11, Plaintiffs filed their response in opposition to the motion for summary judgment [69] and their response to Defendants' statement of material facts [68].  On May 21, Defendants filed their reply brief [72].

## II.   Discussion

### A.   Legal Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions,

---

[16] That same day, Defendants filed a motion for leave to file excess pages with respect to their motion for summary judgment [57]. The motion will be granted.

admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.*

### B.   Analysis

In their motion for summary judgment, Defendants assert that Plaintiffs cannot prevail on their claims under the ADA and section 504 because they cannot demonstrate that CCSD intentionally discriminated against J.D.P.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Similarly, the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded

from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Further, the ADA provides that claims brought pursuant to 42 U.S.C. § 12132 of the Act shall have the same remedies as claims brought pursuant to section 504. 29 U.S.C. § 12133.

In order to state a claim for compensatory damages under the ADA or section 504, a plaintiff must show intentional discrimination. *See Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992); *Ortega v. Bibb Cnty. Sch. Dist.*, 431 F. Supp. 2d 1296, 1300 (M.D. Ga. 2006); *W.C. ex rel. Sue C. v. Cobb Cnty. Sch. Dist.*, 407 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 2005). A defendant's "[g]ood faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages" under section 504 or the ADA. *Wood*, 978 F.2d at 1219. Further, in the educational context, a plaintiff asserting claims under the ADA or section 504 must show more than an IDEA violation based upon a failure to provide a FAPE. *W.C.*, 407 F. Supp. 2d at 1364. The plaintiff must also demonstrate intentional discrimination or "some *bad faith* or *gross misjudgment* by the school . . . ." *Id.* (emphasis added).

The Eleventh Circuit has not conclusively determined whether intentional discrimination should be evaluated under the "deliberate indifference standard" or a more stringent standard such as "discriminatory animus." *See Saltzman v. Bd. of Comm'rs of the N. Broward Hosp. Dist.*, 239 F. App'x 484, 487 (11th Cir. 2007). Deliberate indifference requires knowledge that a federally protected right is likely to be harmed, and there must be a corresponding failure to act upon that likelihood. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). "For conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on the part of a policy maker, that is, someone capable of making an 'official decision' on behalf of the organization." *Id.* As stated in the Court's March 23 order, because the parties have argued this case under the deliberate indifference standard, the Court will analyze Plaintiffs' claims under that standard.

In Plaintiffs' second amended complaint, they assert that "[t]he willful refusal of the Defendants to properly train the ASP staff so as to protect J.D.P. from being physically assaulted, beaten, terrorized, falsely imprisoned and handcuffed . . . violated" the ADA and section 504. Plaintiffs allege that under the 2001 settlement agreement, Defendants

42

were obligated to train the ASP staff so that they would have knowledge of how to supervise J.D.P. Plaintiffs assert that Defendants refused to comply with the training requirement and that this refusal amounted to discrimination against him on the basis of his disability. Plaintiffs further assert that the pattern of discrimination "rises to the level of retaliation when the timing of the various repeated instances of abuse of and discrimination perpetrated against J.D.P. is compared with the efforts of Plaintiff Martin Pope to obtain relief . . . ." Plaintiffs also allege that Defendants "made continued conscious efforts to ignore the federal non-discriminatory laws; violated J.D.P.'s constitutional right to be treated equally; covered up repeated instances of abuse; blatantly ignored the Settlement Agreement; and even ignored repeated pleas for training from their own school's administrators."

Defendants contend that the undisputed facts demonstrate that CCSD provided adequate and appropriately trained staff to work with J.D.P., enabling him to participate in the ASP in compliance with section 504 and the ADA. Defendants assert that both Dr. Kent and Bryant, the individuals responsible for J.D.P.'s ASP, actively participated in meetings to develop appropriate behavioral plans for J.D.P.'s participation in the ASP; took the

steps necessary to implement these plans; and made arrangements for those times that McCullough was absent.  Further, Defendants assert that McCullough was adequately trained to supervise J.D.P. and provided one-on-one supervision that satisfied the ADA and section 504.  Defendants also contend that the ASP staff acted appropriately and according to their respective training in their responses to J.D.P.'s behavior on November 18, 2003.  Finally, Defendants assert that Plaintiffs have not produced any evidence that Defendants' alleged failure to train caused Plaintiffs any harm as a result of the November 18, 2003 incident.

In a rather rambling and unorganized response, Plaintiffs assert that Defendants failed to appropriately train the ASP staff as required by the June 2001 settlement agreement, the ADA and section 504.  Particularly, Plaintiffs point to CCSD's failure to distribute to the ASP staff J.D.P.'s BIPs and section 504 plans, the allegedly inadequate training of McCullough, and the failure to train the entire ASP staff as to the appropriate responses specific to J.D.P.'s behaviors.  Plaintiffs contend that these actions are part of a larger pattern of inadequate supervisory follow-up within CCSD and that this pattern led directly to J.D.P.'s injuries incurred on November 18, 2003.  Plaintiffs assert that "[b]y failing and refusing to secure the training

of the ASP staff for over 3 months, and relying totally on a janitor with exactly two (2) hours of general restraint training and only Dr. Kent's 'summaries' to guide him; and no formal individualized training as the sole designated caretaker for J.D.P. CCSD has violated the ADA and section 504 per se." Plaintiffs contend that they are entitled to damages to compensate them for these "continued" violations.[17]

After an exhaustive review of the record evidence and the parties' numerous arguments, the Court finds that Defendants have demonstrated that there is an absence of evidence to support Plaintiffs' claims that Defendants intentionally discriminated against them by failing to adequately train the ASP staff. Plaintiffs have failed to present any evidence sufficient to rebut Defendants' evidence. Consequently, Defendants are entitled to summary judgment on Plaintiffs' ADA and section 504 claims for an alleged failure to train.

### 1. Adequacy of CCSD's Development and Implementation of J.D.P.'s 504 Plan

The undisputed evidence indicates that after the June 2001 settlement agreement, CCSD actively participated in the development of

---

[17] The Court notes that no "continued" violation can exist in this case, as J.D.P. ceased to attend the ASP as of the 2003-2004 school year.

J.D.P.'s 504 plan and adequately trained the ASP staff in order to implement that plan.

With respect to J.D.P.'s participation in the ASP at BES, Plaintiffs appear to concede that at all times after the June 2001 settlement agreement CCSD provided J.D.P. with an adequate ASP. On September 21, 2001, Martin Pope met with several CCSD administrators and developed a 504 plan that identified the necessary accommodations, anticipated discipline problems, and positive behavior interventions to address these problems. Martin Pope testified that the accommodations identified in this document were reasonable.

Upon appointing McCullough as J.D.P.'s one-on-one ASP worker, Dr. Kent arranged for McCullough to receive training necessary to appropriately implement the 504 plan. Further, after attending the September 25, 2001 meeting with Mountainbrook's behavioral support team, Dr. Kent developed written procedures for working with J.D.P. and distributed this information to McCullough and the ASP assistant coordinators at BES. The success of Dr. Kent and McCullough's efforts is supported by the fact that at the March 12, 2002 IEP meeting, Martin Pope agreed with Dr. Kent's assessment that J.D.P. had not regressed in the ASP

that year, and he attributed this largely to McCullough's efforts. Therefore, Defendants have sufficiently demonstrated that no issue remains for trial regarding the adequacy of J.D.P.'s ASP at BES.

However, Plaintiffs also contest the sufficiency of J.D.P.'s ASP program at CIS. Plaintiffs first point to Bryant's admission that he did not distribute J.D.P.'s BIP and 504 plans to the ASP staff based upon his apparently erroneous belief that these documents were confidential. However, the evidence indicates that in large part, the information contained in these documents regarding J.D.P.'s anticipated behaviors and the appropriate techniques used to address these behaviors had in fact been communicated to the ASP staff and that J.D.P.'s ASP experience at CIS complied with his 504 plans.

Bryant testified that he attended the April 24, 2002 504 plan meeting, during which the 504 plan from the 2001-2001 school year was discussed and kept largely unmodified. Martin Pope agreed that this plan was appropriate for J.D.P. That same day, Bryant observed McCullough working with J.D.P. at his ASP at BES. Bryant testified that he had no reason to believe that McCullough was not adequately trained to supervise J.D.P. Following that meeting, Dr. Kent provided to Bryant all of the

information that she had collected and developed on J.D.P. while he attended the ASP at BES. Further, Bryant attended the fall 2002 IEP meeting in which Kim Pisor discussed the plan that he had developed based upon his observations of J.D.P. Plaintiffs stress that this plan provided key information on behavioral interventions to use with J.D.P.

Although Bryant admits that he did not distribute the actual BIP, 504 plan, or Pisor plan to his staff during the 2002-2003 school year, he testified that he shared with the three ASP assistant coordinators many of the behavior interventions that he learned during the IEP meeting with Pisor. He also worked with the assistant coordinators on J.D.P.'s transitions and the importance of J.D.P.'s schedule. Finally, he had these employees observe McCullough and his interactions with J.D.P. Bryant testified that the only information that he did not share with the ASP assistant coordinators was information regarding behaviors that J.D.P. did not exhibit during the ASP. Thus, although Bryant may not have provided the ASP assistant coordinators with the text of the BIP, 504 plan or Pisor plan, Plaintiffs have pointed to no evidence that Bryant had knowledge of a likely harm to J.D.P. and failed to act on that knowledge with respect to J.D.P.'s rights under the ADA or section 504. At the very worst, Bryant was

negligent in not providing the text of the BIP or 504 plans to his staff, but "[a] showing of simple or even heightened negligence will not suffice" to establish deliberate indifference. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

Plaintiffs also contend that CCSD failed to appropriately train the ASP staff during the 2003-2004 school year. Specifically, they contend that Bryant's failed efforts at hiring an ASP worker to serve as a back-up one-on-one worker for when both he and McCullough were absent demonstrates that CCSD failed to adequately train the ASP staff.

Bryant testified that during the fall of the 2003-2004 school year, he became concerned with McCullough's increasing absences due to problems with his son. Although Bryant would act as J.D.P.'s one-on-one worker when McCullough was absent, in those instances in which Bryant was also absent, he was uncomfortable with the remaining ASP assistant coordinators caring for J.D.P because they were females and J.D.P. responded more positively to males. Thus, Bryant developed a procedure for when both he and McCullough were not able to be present at the ASP to care for J.D.P. Bryant would call Martin Pope to pick J.D.P. up early and would have an ASP worker get J.D.P. off the bus to await Martin Pope's

arrival.  If Bryant had early enough notice, he would have the bus drop

J.D.P. off at Martin Pope's work.  Further, Bryant testified that he made

active efforts to find a male to serve as a back-up ASP worker for those

instances in which he and McCullough were absent.  His efforts included

contacting the special agent supervisor for CIS, Green, and the principal of

CIS, May, to assist in finding an appropriate back-up ASP employee.

Plaintiffs make a great deal of a statement from Cooper in her report on the

November 18, 2003 incident that "We had no adult capable or trained to

supervise [J.D.P.]," contending that this statement indicates that CCSD had

failed to adequately train the ASP staff.  However, this single statement

does not contradict the wealth of evidence that indicates that Bryant

recognized a deficiency in his ASP staff's capabilities and his attempts to

find an additional back-up worker to work with J.D.P.

Again, Bryant's actions do not constitute deliberate indifference.  He

noticed a lack of ASP personnel appropriately trained to work with J.D.P.

when he and McCullough were absent, and he took steps to address this

lack of training.  "[G]ood faith attempts to pursue legitimate ends are not

sufficient to support an award of compensatory damages" under section

504 or the ADA.  *Wood*, 978 F.2d at 1219.

Finally, Plaintiffs assert that CCSD special education administrators, namely Kimzey, Hoskins, Haisten and Green, failed to adequately oversee J.D.P.'s participation in the ASP. The Court disagrees. Nothing in the testimony of the CCSD special education administrators or any other evidence produced by Plaintiffs demonstrates that these administrators had knowledge that J.D.P.'s rights under the ADA or section 504 were likely to be violated and that they failed to act upon that knowledge. Nor have Plaintiffs provided any evidence indicating that the administrators acted with bad faith or gross misjudgment. Instead, the evidence demonstrates that the administrators used well-reasoned professional judgment to delegate the responsibility for the training of the ASP staff to those individuals assigned with direct responsibility for the ASP. The Court cannot find fault in their judgment. *See Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982) ("So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under section 504.").

The decision to delegate this responsibility was negligent at worst, but again, a showing of simple negligence cannot establish deliberate

indifference. *Brown*, 520 U.S at 407. Deliberate indifference can only be established if these administrators acted with "conscious disregard" for J.D.P.'s rights. *Id.* "Such a conscious disregard exists only if either (1) the defendant actually knows that its actions will violate the plaintiff's rights or (2) such a violation is the 'plainly obvious consequence' of the defendant's actions." *Hough v. Shakopee Pub. Sch.*, 608 F. Supp. 2d 1087, 1116 (D. Minn. 2009) (citing *Brown*, 520 U.S. at 410, 412). Plaintiffs have provided no evidence of either actual knowledge by the administrators or that a violation was the plainly obvious consequence of the administrators' decision to delegate training responsibilities to Dr. Kent and Bryant. Thus, these administrators' actions do not rise to the level of intentional discrimination.

The factual record simply does not support Plaintiffs' contentions that CCSD failed to establish reasonable accommodations for J.D.P. and failed to adequately implement these accommodations. Accordingly, the Court finds that Defendants are entitled to summary judgment with respect to Plaintiffs' contention that CCSD failed to adequately develop and implement reasonable accommodations in J.D.P.'s ASP as required by the ADA and section 504.

## 2.    Adequacy of McCullough's Training

Plaintiffs place a great deal of emphasis on CCSD's use of McCullough as J.D.P.'s one-on-one ASP worker and assert that CCSD failed to adequately train him.  Plaintiffs assert that it was inappropriate for CCSD to rely on McCullough and that McCullough was inadequately trained.  The Court finds that this argument is without merit.

The undisputed evidence indicates that from the beginning of McCullough's tenure as J.D.P.'s one-on-one ASP worker, he enjoyed a good rapport with J.D.P. and acted as his one-on-one worker without incident. McCullough, who has a son with special needs, previously established that good rapport during the 2000-2001 school year, during which time he observed Mathis, J.D.P.'s previous ASP one-on-one worker, work with J.D.P.    Mathis had implemented techniques with J.D.P. that she had learned from Mountainbrook, including the use of visual prompts and oral directives.  McCullough testified that he used the oral directives that he learned from Mathis.  McCullough also received information on techniques that Dr. Kent had developed after her meetings with the staff at Mountainbrook.  In addition to this informal training, McCullough received formal training on physical restraint techniques, strategies for working with

children with autism, and techniques for behavior management. He testified that he utilized these techniques in his work with J.D.P. Although McCullough testified that he did not receive J.D.P.'s BIPs or 504 plans, his testimony indicates that he was well-versed in the techniques and behavior interventions contained in these documents.

Importantly, Martin Pope testified that he never had any concern with whether or not McCullough was capable of working with J.D.P. and that he assumed that McCullough had received the training necessary to work with J.D.P. In fact, even after the November 18, 2003 incident, McCullough continued to act as J.D.P.'s one-on-one worker with no complaint from Martin Pope. Moreover, McCullough continues to this day to be J.D.P.'s after-school caretaker, even though the care is no longer provided by CCSD.

While at first blush it may seem odd for CCSD to rely upon a custodian to act as J.D.P.'s one-on-one ASP worker, the facts plainly indicate that McCullough was well-equipped to do so via informal and formal training, that Martin Pope justifiably was at no time uncomfortable with McCullough doing so, and that McCullough performed his duties as J.D.P.'s one-on-one worker very well. Plaintiffs have presented no evidence

that McCullough did not receive training adequate to allow him to properly implement J.D.P.'s BIP or 504 plan. This is confirmed by the fact that when Percy Milligan, J.D.P.'s behavior therapist at the Marcus Institute, observed J.D.P. in his ASP, he informed McCullough and Bryant that no changes were necessary for how McCullough worked with J.D.P. Thus, the record establishes that CCSD's use of McCullough as a one-on-one supervisor and the training that they provided him sufficiently satisfied their obligations under the 2001 settlement agreement, the ADA and section 504.

Moreover, McCullough was not present during the November 18, 2003 incident. Therefore, any alleged inadequacy in his training could not have been the direct or proximate cause of any injuries that J.D.P. sustained through that incident.

Consequently, the Court finds that Defendants are entitled to judgment as a matter of law with respect to Plaintiffs' claim that McCullough was inadequately trained and that this lack of training violated J.D.P.'s rights under the ADA and section 504.

### 3.   Propriety of the ASP Staff's Response to J.D.P.'s Behavior on November 18, 2003

Plaintiffs' final contention and the core of their claim under the ADA and section 504 is that CCSD failed to adequately train the ASP staff at CIS such that they were unable to appropriately address J.D.P.'s behaviors during the November 18, 2003 incident. The evidence does not support this contention.

As an initial matter, nothing in the record indicates that the CCSD staff members who interacted with J.D.P. on November 18, 2003 were inadequately trained to address his behavioral issues that day. Thompson had extensive experience and training working with individuals with developmental disabilities, including training on de-escalation and physical restraint techniques. Hagen taught emotional behavior disordered students at CIS. Cooper's responsibilities during the instructional day at CIS included oversight of CIS's special education program. She also had training regarding autistic students, de-escalation methods, and physical-restraint techniques. Thus, the evidence demonstrates that three of the people who physically restrained J.D.P. did in fact have experience in dealing with children with behavioral issues and in physical restraint and

de-escalation techniques.   Thus, it is clear that these individuals were adequately trained on appropriate responses to aggressive behavior.

However, Plaintiffs assert that the CCSD staff that participated in the November 18, 2003 incident did not use the proper responses to J.D.P.'s behaviors because the ASP staff members had not been adequately trained on his specific behaviors and the appropriate responses. They vociferously contend that the result of this lack of training on J.D.P. caused the ASP staff to unnecessarily escalate the situation. However, while the CCSD personnel may not have used all of the interventions discussed in J.D.P.'s BIP or 504 plan, the evidence does not demonstrate that their actions were unreasonable in light of their professional determination that J.D.P.'s behavior was putting himself and others at risk.

When J.D.P. began asking for McCullough, Thompson redirected him to his routine, a behavior intervention identified in all of J.D.P.'s 504 plans. When J.D.P. followed Thompson out of the building, she reminded J.D.P. of his next preferred task, another behavior intervention discussed in J.D.P.'s 504 plans. Thompson recognized J.D.P.'s spitting as a sign that he was becoming agitated and requested assistance. Canuel then entered the scene and again redirected J.D.P. to his routine.

When J.D.P. plopped down, removed his shoes and socks, and began throwing them, May entered the situation and used a firm voice and directed J.D.P. to get up. J.D.P. complied with this request without any CCSD staff assisting him. When J.D.P. engaged in aggressive behavior by trying to hit Canuel and Thompson, the staff made a reasoned professional judgment that J.D.P. was presenting a danger to himself and/or others, so they physically restrained him. Although Plaintiffs allege that the staff members piled on top of him, the undisputed evidence demonstrates that each individual only held a wrist or an ankle to restrain J.D.P.

When Officer Peabody arrived, he directed J.D.P. to get up, which J.D.P. did, and then took him to the timeout room. Upon a determination that J.D.P. could injure himself by hitting the Plexiglas window in the timeout room, Officer Peabody made a professional judgment to restrain him by placing handcuffs on him. The Court finds that absolutely none of the actions taken by the CCSD employees that afternoon was unreasonable or inconsistent with the training that these individuals had received.

The fact that these individuals did not utilize all of the specific techniques identified in J.D.P.'s BIP, 504 plans or the Pisor plan or reacted differently from how McCullough testified he would have reacted is of no

moment, as there is nothing in the evidence indicating that their method of restraint harmed J.D.P. in any way or was inconsistent with their professional training.    Further, the undisputed evidence, including McCullough's own testimony, demonstrates that when J.D.P. was hitting, kicking, or presenting a risk of running away it was necessary to restrain him.   Additionally, Dr. Trapani testified that even if the proper restraint technique of the "backwards two-man carry" had been implemented by CCSD employees, there was no guarantee that J.D.P. would have reacted any differently that day.   She testified that she had observed J.D.P. "lash out" even when the appropriate technique was followed to the letter and that the potential of J.D.P. lashing out was omnipresent.   This testimony is further bolstered by the fact that Dr. Fisher of the Marcus Institute had suggested, and Martin Pope approved of, the use of a "blue room" to seclude J.D.P. in those instances in which he was unmanageable or was putting himself or other children in danger.    Presumably, the Marcus Institute and Martin Pope would not have approved of the use of such a protocol if J.D.P. was at all times compliant with other, less intrusive behavior interventions used when he was becoming aggressive.

The record shows that even though these individuals had received no specific training on J.D.P., they utilized many of the techniques identified in his 504 plan. Further, the undisputed evidence shows that even if CCSD had trained all of the participants in the November 18, 2003 incident on all of the specifics regarding J.D.P. and the suggested behavior interventions, there was no guarantee that such training would have prevented J.D.P. from reacting aggressively with this staff. The staff made reasoned professional judgments, reacted in a way to minimize the harm to J.D.P., themselves, and others, and did so in accordance with training that they had received.

Finally—and significantly—Defendants have demonstrated that Plaintiffs have not adduced any evidence indicating that J.D.P. was actually harmed as a result of the November 18, 2003 incident. McCullough testified that he did not notice any regression in J.D.P.'s behavior after the incident. Additionally, behavior data from the Marcus Institute does not show any regression in J.D.P.'s behavior in the following months. Plaintiffs have not provided any evidence to contradict McCullough's testimony or the Marcus Institute's data. Consequently, Plaintiffs have failed to

demonstrate that J.D.P. suffered any harm as a result of the November 18, 2003 incident.

The Court thus finds that Plaintiffs have failed to produce any evidence demonstrating that the CCSD staff inappropriately responded to J.D.P.'s behavior on November 18, 2003, that their response was due to a lack of training, or that J.D.P. was harmed in any way.   Accordingly, Defendants are entitled to summary judgment with respect to these issues.

## III.  Conclusion

Defendants' motion for summary judgment [56] and motion for leave to file excess pages [57] are hereby GRANTED.  The Clerk is DIRECTED to enter judgment in favor of Defendants' on Plaintiffs' claims under the ADA and section 504 for the alleged failure to train the ASP staff.

Additionally, after careful consideration, the Court hereby declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' remaining state law claims.   The Court DISMISSES the remaining state law claims. The Clerk is DIRECTED to close this case.

IT IS SO ORDERED this 18th day of August, 2010.

Timothy C. Batten, Sr.
United States District Judge